IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-254

Filed: 17 November 2015

Durham County, No. 12 CVS 3532

LAW OFFICES OF PETER H. PRIEST, PLLC, Plaintiff,

v.

GABRIEL COCH and INFORMATION PATTERNS, LLC, Defendants.

Appeal by Plaintiff from Order on Defendants' Motion to Dismiss entered 25 January 2013 and from Order and Opinion entered 5 November 2014 by Judge James L. Gale in Durham County Superior Court. Heard in the Court of Appeals 26 August 2015.

*Bryant & Ivie, PLLC, by John Walter Bryant and Amber J. Ivie, for Plaintiff.*

*Glenn, Mills, Fisher & Mahoney, P.A., by Carlos E. Mahoney, for Defendants.*

STEPHENS, Judge.

Plaintiff Law Offices of Peter H. Priest, PLLC, argues that the trial court erred in granting summary judgment to Defendants Gabriel Coch and Information Patterns, LLC, on Plaintiff's claims for breach of contract and fraud, and in dismissing Plaintiff's claims for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices, as well as dismissing Priest as a party in his individual capacity. After careful consideration, we hold that the trial court did not err and consequently affirm both its Order and its Order and Opinion.

## I. *Factual Background and Procedural History*

This case presents as an issue of first impression the question of whether an attorney who enters into a business transaction with a client as compensation for a legal representation can be barred from enforcing the terms of their agreement based on the attorney's failure to comply with the explicit requirements of Rule 1.8(a) of the North Carolina Rules of Professional Conduct.

### A. *Factual Background*

Plaintiff Law Offices of Peter H. Priest, PLLC, is a North Carolina law firm specializing in patent law, and its principal, Peter H. Priest, is a North Carolina-licensed attorney. Beginning in 2004, Priest and his law firm[1] represented Defendants Gabriel Coch and Information Partners, LLC ("IP"), in the filing and prosecution of a patent for a computer program for geo-collaboration and internet-based mapping ("the Program"). Coch is a member-manager of IP, which is a small information technology start-up that was formed as a North Carolina limited liability company in 2003 for the purpose of developing the Program, which Coch co-invented with his partners Graham Knight and Mark Smith, who are both citizens and residents of the United Kingdom and are also members of IP.

---

[1] When the representation at issue in this case began, Priest's firm was known as Priest & Goldstein, PLLC, which dissolved in 2011.

In October 2003, Coch began discussions about filing a patent application for the Program with his neighbor, Joe Agusta, who was working at the time for Priest's law firm as an associate attorney. Agusta outlined the procedure and fees for filing a patent application, as well as his firm's professional fees, and eventually Coch agreed to go forward. After submitting a provisional application on Coch's behalf to the United States Patent and Trademark Office ("USPTO") on 17 December 2004, Agusta filed a formal patent application, titled "Methods and Apparatus for Geo-Collaboration," with the USPTO on 15 December 2005. Around the same time, Coch, Knight, and Smith assigned their interests in the Program to IP, thereby making IP the owner of the patent application and a client of Priest's firm in any further prosecution thereof. According to an engagement letter dated 7 November 2005, which Priest later described as a "per-task" agreement for legal services, the fees due to Priest's firm for drafting and filing the patent application were billed at a rate of $250 per hour and capped at $10,000. That amount was exhausted during the early stages of the patent application, and IP paid $10,000 to Priest's law firm in August 2006.

On 24 September 2009, Priest received a "non-final rejection" from USPTO regarding the claims in IP's patent application.[2] After learning that Coch, Knight,

---

[2] Agusta left Priest's law firm in 2006, and the record indicates that the subsequent legal work in this matter was performed by Priest himself and his employee, Dr. Jerry Pechanek.

and Smith might be financially unable to proceed with the patent registration, Priest filed a response to the "non-final rejection" at his firm's expense. On 18 February 2010, Priest received a Notice of Allowance, which indicated that a patent would be issued for IP's claims upon the filing of certain paperwork and payment of required fees within three months. Priest informed Coch of this development, and Coch agreed with Knight and Smith to split the fees evenly.

On 19 March 2010, shortly after the Notice of Allowance was issued, Priest and Coch met to discuss entering into an agreement ("the Agreement") regarding how to generate revenue through licensing the patent. Given Coch's concerns that he and IP were financially unable to pay the same rate Priest had charged to file the patent application, the two men also discussed how best to compensate Priest for the work his firm had already performed without pay since 2009. Eventually, they agreed in principle that going forward, Priest and his law firm would continue to prosecute and maintain IP's patent and pay 25% of the actual costs of doing so, with the remainder split evenly between Coch, Knight, and Smith, in return for Priest receiving 25% of the proceeds Priest helped to generate from the patent. Coch's contemporaneous emails to Knight and Smith demonstrate that Coch believed the Agreement's terms would make Priest "an equal partner in pushing the Patent forward" based on the rationale that "there is still work to be done, of which I don't know anything and

[Priest] is willing to do it for his equity portion." At the end of the meeting, Priest agreed to draft the Agreement and send it to Coch for his input and signature.

Over the next several weeks, after the managing partner of Priest's firm completed a first draft of the Agreement, Priest handled all subsequent edits and revisions and continued to confer via email and in person with Coch, who requested that Knight and Smith be added as parties. Priest would later testify that during a meeting on 23 April 2010, he orally notified Coch that he and IP should have another attorney review the Agreement, given Priest's role in drafting it, but Coch declined because "he didn't feel like that was necessary." On 5 May 2010, Coch and Priest met to review the final draft of the Agreement. At the end of their meeting, Priest signed the final draft. Priest thereafter contended that he believed Coch signed it as well and then took it with him to obtain signatures from Knight and Smith. On 6 May 2010, Priest emailed a copy of the final draft to Coch so that he could circulate it to Knight and Smith.

In keeping with their earlier discussions, the terms of the Agreement provided that Priest was "willing to work with [Coch, Knight, and Smith] in identifying a licensee or licenses [sic] and negotiating a license or other agreement" on IP's behalf and that Priest would therefore continue to prosecute the patent by filing necessary paperwork and writing letters to potential licensees "at no further cost." Instead, the Agreement provided that the out-of-pocket, actual costs of patent filing, prosecution,

and maintenance would be split equally between Priest, Coch, Knight, and Smith. The Agreement also included a section entitled "LICENSING," which provided, *inter alia*, that Priest would have the "exclusive right and responsibility for negotiating and arranging licenses and options" for the patent for three years, and that Coch, Knight, and Smith would "put forth reasonable efforts in instituting a program for licensing the [patent]" and "consult with [Priest] on the licensing strategy, commercialization effort and licensing terms" and would pay 75% of any costs Priest incurred in his licensing efforts. The same section also outlined the scheme by which the parties would divide proceeds generated by the patent as follows:

> a) GROSS REVENUES from licenses negotiated by PRIEST under this AGREEMENT will be distributed on an annual basis on or before December 31 of each year, in the following manner:
>
> b) PATENT EXPENSES and LICENSE EXPENSES shall be reimbursed as outlined above, and then Twenty-Five Percent (25%) of NET REVENUES shall be distributed to each Party.

A separate, earlier section of the Agreement defined "NET REVENUES" as "GROSS REVENUES minus PATENT EXPENSES and LICENSING EXPENSES," and further defined "GROSS REVENUES" as "the total actual amount of all fees, royalties, and/or consideration, of any kind, collected from licensing, optioning or selling the [patent]." The Agreement did not include any sections specifically addressing the sale of the patent, nor did it expressly convey any interest in the

patent or IP's business to Priest or his law firm, but it did grant certain rights to Priest while imposing obligations on Coch, Knight, and Smith that would exist until the patent's expiration in 2025.

On 7 May 2010, Coch forwarded the Agreement to Knight and Smith to review and sign, but never received a signed copy from either of them and later testified that he did not remember ever signing or returning the Agreement to Priest himself. Indeed, during the discovery phase of the ensuing lawsuit, Priest was unable to produce any signed or executed copies of the Agreement. Nevertheless, at the time, both Coch and Priest believed they had entered into the Agreement and proceeded according to its terms, with Priest paying the full costs to complete registration of the patent and then billing Coch, Knight, and Smith for 75% of his expenses, which they paid.

On 15 June 2010, USPTO issued the patent for the Program. In November 2010, Priest sent letters to twelve potential licensees, including representatives of Microsoft, Google, and Facebook, but ultimately generated little interest in the patent. On 9 June 2011, Priest sent follow-up letters to the same twelve potential licensees and received no response. No licenses were ever successfully negotiated, and eventually, Coch grew dissatisfied with Priest's lack of progress.

In September 2011, Coch contacted William J. Plut, a patent broker at Patent Profit International ("PPI") in Silicon Valley, to discuss retaining PPI to sell the

patent. Based on his conversation with Plut, Coch emailed Knight and Smith to update them and to request that he receive an additional 10% of any potential sale as a finder's fee. In a subsequent email to Knight and Smith, Coch stated that the sale proceeds "will be split 4 ways as Peter Priest, the attorney who has filed for continuations and has kept this alive from a patent/legal perspective has ¼ of it, as we agreed some time ago."[3] On 4 October 2011, Plut sent Coch a copy of PPI's standard engagement agreement. Given that Priest still had the exclusive right to license the patent under the Agreement, Coch contacted him to request his approval. Priest, who was on vacation in California at the time, held a meeting with Plut and ultimately agreed to hold his exclusive licensing rights in abeyance so that PPI could sell the patent.

By early January 2012, Plut and PPI had placed the patent on the market and mailed a detailed sales package to prospective purchasers. During this time, Priest assisted PPI by making minor edits to the sales package, participating as the prosecuting attorney in a handful of telephone conferences, and sending files to potential purchasers. Within two months, Plut and PPI found a buyer and completed negotiations to sell the patent for $1,000,000. The sale closed on 16 March 2012, and the buyer wired payment to IP's bank account on 19 March 2012. After the close of the sale, Priest claimed that the terms of the Agreement entitled his law firm to

---

[3] Coch later testified that he had not reviewed the Agreement before sending this email, and that his statement that Priest was entitled to 25% of the sales proceeds was a mistake.

$200,000, which amounted to 25% of the sale's net revenue, reduced by PPI's 20% commission and Coch's finder's fee. Coch refused this demand, given that he believed the Agreement only entitled Priest to 25% of any licensing proceeds he personally generated, rather than proceeds from the sale of the patent by a third party broker.

*B. Procedural History*

On 19 June 2012, acting on behalf of his law firm and in his individual capacity, Priest filed a complaint in Durham County Superior Court alleging claims for breach of contract, breach of fiduciary duty, constructive fraud, fraud, and unfair and deceptive trade practices against Coch and IP based on their refusal to pay Priest 25% of the patent sale proceeds he alleged he was entitled to under the Agreement. On 24 June 2012, the matter was designated a mandatory complex business case and assigned to Chief Special Superior Court Judge for Complex Business Cases James L. Gale. On 10 July 2012, a consent order was entered directing Coch and IP to place $200,000, representing Priest's purported share of the sale proceeds, in escrow.

On 27 August 2012, Coch and IP filed a motion to dismiss Priest's claims under N.C.R. Civ. P. 12(b)(6) and dismiss Priest himself as a party due to a lack of standing under N.C.R. Civ. P. 12(b)(1). On 25 January 2013, the trial court entered an Order on this motion, which it granted in part and denied in part. After concluding that Priest himself was not a proper party to the action because his complaint alleged that he signed the Agreement on behalf of his law firm rather than in any individual

capacity, the court granted the motion to dismiss Priest as a party. The court also dismissed Priest's law firm's claims for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices. In explaining the rationale for this decision, the court noted that, "[f]airly read, the [c]omplaint seeks to enforce a contingent fee agreement," which would certainly trigger a fiduciary duty owed by Priest and his firm as providers of legal services to Coch and IP, but is generally not the type of arrangement that would give rise to a fiduciary duty owed by Coch and IP as clients. Thus, based on its review of the complaint, the court reasoned that Priest and his firm had failed to state a claim for either breach of fiduciary duty or constructive fraud, which likewise depends upon the violation of a fiduciary duty. Moreover, given that the complaint was based on the Agreement for the payment of attorney fees, the court also dismissed the unfair and deceptive practices claim, reasoning that although Chapter 75 of our General Statutes declares "unfair or deceptive acts or practices in or affecting commerce" to be unlawful, the statutory definition of "commerce" it provides explicitly excludes "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75.1-1(a), (b) (2013). However, the court denied the motion to dismiss Priest's law firm's claims for breach of contract and fraud.[4]

---

[4] On 20 February 2013, Coch and IP filed a motion to stay the action or dismiss these remaining claims for lack of subject matter jurisdiction due to Priest's and his firm's noncompliance with Rule 1.5(f) of North Carolina's Rules of Professional Conduct because they failed to notify Coch and IP of the State

On 21 January 2014, Coch and IP filed a motion for summary judgment against Priest's law firm's remaining claims for breach of contract and fraud, contending that the Agreement was a business transaction which could not be enforced due to Priest's failure to advise Coch and IP in writing as to the desirability of obtaining independent counsel and Priest's failure to obtain their written informed consent to the Agreement's essential terms as required by Rule 1.8(a) of the Rules of Professional Conduct. Coch and IP argued further that even if the Agreement was enforceable, its express terms limited Priest to 25% of proceeds resulting from licenses he personally negotiated.

In support of this motion, Coch and IP included an affidavit from James G. Passe, a North Carolina attorney who specializes in patent and trademark law. Based on his three decades of experience in the field, Passe concluded the Agreement represents a business transaction. As Passe explained, "It is my experience that a commission on the sale of a patent by a third party is not a standard transaction. I have never heard of such an arrangement during my 30+ years of practice as a patent attorney." Moreover, according to Passe, "[i]t is not common for a patent attorney to enter into an agreement to license or sell a client's patent." Although he

---

Bar's Fee Dispute Resolution Program at least 30 days before filing suit. After the court denied this motion by order entered 19 April 2013, Coch and IP filed an amended answer to Priest's firm's complaint in which they denied that the Agreement entitled Priest to take 25% of proceeds arising from the sale of the patent by a third party and also raised as an affirmative defense Priest's failure to advise Coch and IP of the terms of the parties' Agreement in writing.

acknowledged that it would be ethically permissible for an attorney to enter such an arrangement with a client if he followed Rule 1.8(a)'s explicit requirements, Passe observed that there was no evidence Priest had done so here, which he found particularly problematic given that the Agreement was not the product of an "arm's-length" transaction because Priest "had greater influence and control over the negotiations due to his legal skill and training along with the special trust and confidence that exists in the attorney-client relationship. His law firm also exclusively drafted the provisions in the Agreement." Furthermore, Passe found the Agreement's terms did not clearly inform Coch and IP that Priest's firm would be entitled to 25% of patent sale proceeds because "[t]he Agreement only indicates that Mr. Priest's law firm would receive 25% of the net revenues from licenses negotiated by Priest. The term 'license' is different and not synonymous with a sale of a patent." Passe noted further that, "I have never seen a 25% commission for licensing a patent. In my experience, commissions between 0.5% - 10% are customary for licensing work."

On 25 March 2014, Priest filed a motion for summary judgment in his firm's favor, arguing that the Agreement was validly entered and enforceable; that its terms clearly reached all proceeds from monetizing the patent, whether by licensing or sale given that its definition of "gross revenues" explicitly included both; that our State's Rules of Professional Conduct are not intended to be used as a procedural weapon to

void an enforceable contract, based on this Court's prior holding in *Baars v. Campbell Univ., Inc.*, 148 N.C. App. 408, 558 S.E.2d 871, *disc. review denied,* 355 N.C. 490, 563 S.E.2d 563 (2002), as well as Comment [7] to Rule 0.2; and that the Agreement did not fall within the scope of Rule 1.8(a), which Priest characterized as only applying to "a business transaction . . . directly adverse to a client," because Priest and his firm entered into the Agreement in order to help Coch and IP.

On 5 November 2014, the trial court entered an Order and Opinion granting summary judgment in favor of Coch and IP based on Priest's failure to comply with Rule 1.8(a)'s explicit requirements. After first noting that "at the heart of this matter is the determination of whether a valid, enforceable contract exists," the court analyzed and ultimately rejected Priest's reliance on *Baars*, reasoning that although it is well established that violations of the Rules of Professional Conduct do not give rise to an affirmative claim of civil liability, in the present case, Coch and IP were not asserting that Priest or his law firm were liable for any harm, but instead were contesting their own liability. Thus, as the court noted, "The issue is whether the client can use the Rules defensively even though the client may not seek to impose civil liability based on a violation of the Rules."

Priest insisted, based on Comment [7] to Rule 0.2, that the Rules cannot be used defensively, but the trial court held that this argument was foreclosed by this Court's decision in *Cunningham v. Selman*, 201 N.C. App. 270, 689 S.E.2d 517 (2009),

which held that neither Comment [7] nor the principles enunciated in *Baars* prohibited a client from using her attorney's noncompliance with the State Bar Fee Dispute Resolution Program as a jurisdictional defense against his subsequent lawsuit. After noting that Priest's argument in the present case "is identical to the argument rejected in *Cunningham,*" the court rejected any suggestion that *Cunningham*'s central holding

> is made inapplicable simply because the *Cunningham* appeal followed a fee-dispute administrative proceeding. Rather, the [c]ourt finds that this case is controlled by *Cunningham*'s holding that the affirmative use of the Rules as a defense to an attorney's claim is proper where the procedural requisites of Rule 1.8 are not satisfied. Rule 1.8 reflects that attorneys have a special obligation when dealing with their clients and are thus fairly held to abide by the Rules as a condition of their own recovery when the recovery is based on contracts with their clients.

Having determined that Coch and IP could raise violations of Rule 1.8 to defend against Priest's lawsuit, the court then focused on whether Priest had complied with the Rule. Despite Priest's claims to the contrary, the trial court declined to interpret the scope of Rule 1.8(a) as applying only to "a business transaction . . . directly adverse to a client," and explained that Priest's narrow reading of the Rule depended on an erroneous attempt "to graft the condition of 'directly adverse' onto any business transaction between attorney and client, essentially ignoring the disjunctive 'or' between business transactions and adverse interests."

Instead, the court interpreted Rule 1.8(a) broadly to apply to "any business transaction" between an attorney and his client, regardless of whether or not their interests are directly adverse. Noting Priest's deposition testimony that the purpose of the Agreement was "to allow my firm to share in the success of the value of the family of patents," the court found that the Agreement represented a business transaction and was therefore subject to Rule 1.8(a)'s requirements. The court assumed without deciding that Priest could satisfy Rule 1.8(a)(1) by proving that the Agreement's terms were fair and reasonable, but nevertheless concluded that the Agreement did not comply with Rule 1.8(a)(2), given Priest's failure to advise Coch and IP in writing to seek review by independent counsel, nor did it comply with Rule 1.8(a)(3) in light of the fact that Priest never obtained written informed consent from his clients as to the Agreement's essential terms. Finding no genuine issue of material fact that Priest had failed to comply with these requirements, the court ruled that Coch and IP "may elect to void the [Agreement] if it is otherwise valid" and "may defend against [Priest's] claim based on [his] failure to comply with Rule 1.8." The court consequently granted summary judgment in Coch's and IP's favor.[5] Priest gave written notice of appeal to this Court on 4 December 2014.

---

[5] In addition, while noting that its application of Rule 1.8 was dispositive, for the sake of completeness the court provided alternative conclusions explaining how Priest's claims for fraud and breach of contract would have fared had they survived the Rule 1.8-based defense. On the one hand, the court concluded Priest's fraud claim would have failed as a matter of law given the absence of any evidence indicating that, at the time Coch entered into the Agreement, he did not intend to deliver 25% of the

*II. Analysis*

Priest and his law firm argue that the trial court erred in granting summary judgment to Coch and IP. We disagree.

"Summary judgment is appropriate when there is no genuine issue as to any material fact and any party is entitled to a judgment as a matter of law." *Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006) (citations and internal quotation marks omitted). We review the trial court's order granting summary judgment *de novo. Id.*

In the present case, Priest contends that the trial court should have granted summary judgment in his law firm's favor on the breach of contract and fraud claims because, in Priest's view, the express terms of the Agreement clearly entitle his law firm to 25% of proceeds from the sale of the patent. Priest further contends there is ample evidence in the record that Coch understood the promise he was making, but never intended to keep it, and instead concocted an elaborate scheme to induce Priest to provide free legal services before breaching their bargain. Priest also argues that the trial court erred in dismissing him as an individual party to the action and in

---

proceeds from the license or sale of the patent, or that Coch made any other knowingly false statement to induce Priest. On the other hand, as to the breach of contract claim, the court noted that both parties pointed to the same section of the Agreement to support their arguments that it did or did not grant Priest 25% of the gross revenues from the sale of the patent, and ultimately concluded that the language of the Agreement was sufficiently ambiguous as to warrant denying summary judgment to either party. Although both parties argue in their appellate briefs that the trial court erred in its alternative holdings, we need not reach those arguments because, as discussed *infra*, we agree with the trial court that the Rule 1.8 issue is dispositive.

dismissing his claims for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices. Priest argues further that the trial court erred in refusing to allow him to shift his theory of the case after the pleadings were closed and discovery was completed in order to assert claims for breach of an oral contract and *quantum meruit*.

However, before any of these claims can be addressed, we must turn first to the threshold issue of whether the trial court erred in granting summary judgment to Coch and IP based on its determination that they could defend against Priest's claims for his failure to comply with Rule 1.8(a)'s explicit requirements. On this point, Priest argues that the trial court erred by concluding that: (1) his purported violation of the Rules of Professional Conduct could be used defensively as a procedural weapon against his claim; and (2) Rule 1.8(a) applied to the Agreement, which Priest insists was not a business transaction. We address each of these arguments in turn.

*A. Defensive use of Rules violation*

Priest argues first that the trial court erred in allowing Coch and IP to rely on his purported violation of Rule 1.8(a) as a procedural weapon to defend against his claim. In support of this argument, Priest cites our prior decision in *Baars*, 148 N.C. App. at 421, 558 S.E.2d at 879 (recognizing that "[t]his Court has held that a breach

of a provision of the Code of Professional Responsibility is not in and of itself . . . a basis for civil liability") (citation and internal quotation marks omitted), and the plain language of Comment [7] to Rule 0.2. According to Comment [7]:

> Violation of a Rule should not give rise itself to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a Rule.

N.C. Rev. R. Prof. Conduct 0.2, cmt. [7]. As the trial court noted in its Order and Opinion, in *Cunningham*, this Court rejected an argument that was virtually identical to the one Priest relies on here. In *Cunningham*, we affirmed the trial court's dismissal for lack of subject matter jurisdiction of an action brought by an attorney against his former client to recover his fee for representing her in an action for equitable distribution based on the attorney's failure to comply with the State Bar's Fee Dispute Resolution Program as required by Rule 1.5(f). 201 N.C. App. at 277, 689

S.E.2d at 523. When the attorney argued on appeal that precedent prohibited his former client from using the Rules as a procedural weapon, we were not persuaded. *Id.* at 287, 689 S.E.2d at 528. As we explained in *Cunningham*,

> [t]he fact that the Rules are not designed to be a basis for civil liability; that the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons; and that nothing in the Rules should be deemed to augment any substantive legal duty of lawyers does not mean that the Rules of Professional Conduct have utterly no bearing on the proper resolution of civil litigation. Instead, we believe Comment [7] and the principle enunciated in *Baars* are directed primarily toward cases in which a former client claims that an attorney is civilly liable, based, in whole or in part, on alleged violations of the Rules of Professional Conduct. The present case does not involve such a scenario. Furthermore, neither Comment [7] nor *Baars* categorically precludes the use of standards set out in the Rules of Professional Conduct in civil litigation; instead, they simply point out that the Rules of Professional Conduct do not have the primary purpose of establishing a standard of care for use in determining civil liability. In this case, however, the principle upon which Plaintiff relies is totally inapplicable because Defendant does not seek to hold Plaintiff liable for an alleged violation of Rule 1.5(f); instead, Defendant found herself on the receiving end of civil litigation after having invoked the State Bar's fee dispute resolution process and attempted to use Plaintiff's noncompliance with the State Bar's rules as a jurisdictional defense to Plaintiff's claim.

201 N.C. App. at 287-88, 689 S.E.2d at 529 (internal quotation marks and certain brackets omitted).

Here, Priest argues that the trial court's reliance on *Cunningham* was misplaced due to what he contends is a critical distinction between *Cunningham*'s procedural posture and that of the present facts. Specifically, Priest argues that because this case does not involve the State Bar's Fee Dispute Resolution Program, his claim is not barred by a lack of subject matter jurisdiction, and thus the trial court erred by following *Cunningham* instead of the approach taken by our more recent decision in *Robertson v. Steris Corp.*, __ N.C. App. __, 760 S.E.2d 313 (2014), *disc. review denied*, __ N.C. __, 768 S.E.2d 841 (2015). Priest argues that *Robertson* stands as further confirmation that *Baars* and Comment [7] to Rule 0.2 prohibit the use of an attorney's violation of the Rules as a procedural weapon. We are not persuaded.

In *Robertson*, we upheld the trial court's award of costs and attorney fees in *quantum meruit* to an attorney who brought suit against his former clients after they fired him on the eve of accepting a lucrative settlement offer and refused to pay for his services. *Id.* at __, 760 S.E.2d at 316. The former clients argued that because the contingent fee contract for their representation was never put into writing as Rule 1.5(c) requires, the award of costs and attorney fees should be vacated as contrary to public policy due to the attorney's violation of the Rules and a line of cases in which our State's appellate courts refused to allow recovery in *quantum meruit* where the underlying contracts giving rise to such claims were unenforceable due to violations of public policy. *Id.* at __, 760 S.E.2d at 320. In rejecting this argument, we explained

that the cases the former clients relied upon "concern[ed] violations of public policy regarding the *content* of contracts rather than their *form*" and concluded the Rule 1.5(c) violation at issue was one of form rather than content. *Id.* We therefore held that even though the contingent fee contract for the representation was unenforceable due to the violation of Rule 1.5(c), the attorney could still recover in *quantum meruit* because

> the fact that an agreement for legal representation was determined to be in violation of the Rules of Professional Conduct and unenforceable is of no consequence where an attorney's right of recovery arises in *quantum meruit*, because the trial court's award of fees is based upon the reasonable value of [the attorney's] services and not upon the failed agreement.

*Id.* at __, 760 S.E.2d at 321 (citation and internal quotation marks omitted). We found support for our holding in *Baars* and Comment [7] to Rule 0.2 and, more importantly, in "the comments to Rule 1.5 itself [which] explicitly provide that a trial court's determination of the merit of the petition or the claim [for costs and attorney fees] is reached by an application of law to fact and not by the application of this Rule." *Id.* at __, 760 S.E.2d at 319 (citation, internal quotation marks, and emphasis omitted).

Our review of *Robertson* does not support Priest's argument, which ignores the fact that the reason we cited *Baars* and Comment [7] to Rule 0.2 in the context of rejecting the former clients' argument that the attorney should be barred from recovery in *quantum meruit* as a matter of public policy was because we recognized

that controlling precedent indicated that the attorney's violation of Rule 1.5(c) rendered the contingent fee contract for the representation unenforceable and would have otherwise barred him from any recovery. *See id.* at __, 760 S.E.2d at 321. Thus, in our view, far from establishing that *Baars* and Comment [7] operate as something akin to a bright-line rule prohibiting the use of Rules violations as procedural weapons, *Robertson* actually lends further support for the proposition that an attorney's failure to comply with the Rules of Professional Conduct can indeed function as a bar to recovery in a subsequent action for attorney fees. *Robertson* did nothing to disturb *Cunningham*'s central holding that although an attorney's violation of the Rules does not give rise to an independent cause of action, neither Comment [7] nor *Baars* prohibits the defensive use of such violations against a lawsuit subsequently initiated by the same attorney. Instead, we conclude that *Robertson* and *Cunningham* demonstrate that the question of whether an attorney's violation of a Rule can be used defensively should be answered by examining what public policy that specific Rule aims to promote, or what harm it seeks to prevent, as evidenced by the Rule's plain language, the Comments to it, and related precedent.

Here, Comment [1] to Rule 1.8 provides that "[a] lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property, or financial transaction with a client[.]" N.C. Rev. R. Prof.

Conduct 1.8, cmt. 1. This Comment illustrates a strong public policy rationale for allowing violations of Rule 1.8 to be used defensively. Moreover, we agree with the trial court's observation that the Rule itself reflects the special obligation the attorneys of this State have when dealing with their clients, and we share the trial court's conclusion that, for the sake of maintaining the public's trust, attorneys should be held to abide by Rule 1.8(a)'s explicit requirements as a condition of their own recovery when that recovery is based on business transactions with their clients. While this may be an issue of first impression in our State, we note that courts in other jurisdictions have reached the same conclusion as we reach here. *See, e.g.*, *Stillwagon v. Innsbrook Golf & Marina*, No. 2:13-CV-18-D, 2014 WL 4272766 (E.D.N.C. Aug. 29, 2014) (holding that a contract was unenforceable due to the plaintiff attorney's noncompliance with Rule 1.8(a)); *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364 (Mich. Ct. App. 2002) (rejecting plaintiff law firm's argument that violations of Michigan's rules of professional conduct against conflicts of interests may not be used as procedural weapons to defend against lawsuits and observing that "it would be absurd if an attorney were allowed to enforce an unethical fee agreement through court action, even though the attorney potentially is subject to professional discipline for entering into the agreement"), *review denied*, 655 N.W.2d 561 (Mich. 2002). We therefore have no trouble in concluding that the trial court did not err in

its determination that an attorney's violation of Rule 1.8(a) can be used defensively against him.

*B. Priest's violation of Rule 1.8(a)*

Rule 1.8(a) provides that

> [a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest directly adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

N.C. Rev. R. Prof. Conduct 1.8(a).

Priest does not dispute the fact that by failing to advise Coch in writing of the desirability of seeking independent counsel to review the Agreement and by failing to obtain informed consent in writing from Coch, Knight, and Smith as to the Agreement's essential terms, he failed to comply with Rule 1.8(a)(2) and (a)(3). Instead, Priest argues that Rule 1.8(a) does not apply to the Agreement, which he characterizes as both a contingent fee contract and an accommodation to a long-term

client, rather than a business transaction. Thus, according to Priest, the trial court should have analyzed the Agreement under Rule 1.5's less-demanding standard for fee agreements in the context of ongoing representations.

Here again, our review of the record does not support Priest's argument. It is clear that Coch and IP hired Priest's law firm to assist them in applying for a patent. While the 7 November 2005 engagement letter only specifically addresses the first phase of filing the patent application, we can infer that both parties contemplated that the representation would continue once USPTO responded to that application. While this process spanned multiple years, the representation had one clearly defined goal—obtaining a patent—with compensation for Priest's firm at a clearly defined rate. We therefore view the Agreement as a fundamental shift in the nature and objective of the representation, a shift that Coch and IP's affidavit from Passe demonstrates is "not a standard transaction" in patent and trademark law and is thus more accurately viewed as a business transaction in which Priest and his firm exercised influence and control from a position of trust when dealing with their legally unsophisticated clients to obtain unusually favorable terms for their own compensation.

Priest also argues that the Agreement is not within the scope of Rule 1.8(a) because the Rule only applies to "a business transaction . . . directly adverse to a client." However, as the trial court correctly noted, this interpretation of the Rule

utterly distorts its meaning by ignoring the disjunctive "or" between the Rule's express prohibition against entering into "a business transaction with a client," and its express prohibition against "knowingly acquiring an ownership, possessory, security or other pecuniary interest" that is directly adverse to the client. In our view, Rule 1.8(a)'s plain language prohibits both the former and the latter unless the attorney complies with all three of the requirements enumerated in the subsections that follow. There is no genuine dispute of material fact that Priest failed to comply with Rule 1.8(a)(2) and (a)(3). We therefore hold that the trial court did not err in granting summary judgment in favor of Coch and IP.

### C. Quantum Meruit

Priest argues in the alternative that even if the Agreement is unenforceable based on his violation of Rule 1.8(a), he should still be entitled to recovery in *quantum meruit*. We disagree.

It is well established that "an agent or attorney, even in the absence of a special contract, is entitled to recover the amount that is reasonable and customary for work of like kind, performed under like conditions and circumstances." *Robertson*, __ N.C. App. at __, 760 S.E.2d at 321 (citations and brackets omitted). Although we have observed that a party who seeks recovery in *quantum meruit* while also seeking to recover on an express contract should ideally plead these claims in the alternative in her complaint, *see, e.g.*, *James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 179 N.C.

App. 414, 419, 634 S.E.2d 557, 560 (2006), *appeal dismissed and disc. review denied*, 361 N.C. 355, 644 S.E.2d 226 (2007), we have also recognized that while "the better practice is to plead both the express and implied contracts, recovery in *quantum meruit* will not be denied where a contract may be implied from the proven facts but the express contract alleged is not proved[,]" *Paxton v. O.P.F., Inc.*, 64 N.C. App. 130, 132, 306 S.E.2d 527, 529 (1983) (citation omitted), so long as it "appear[s] from the facts that services are rendered by one party to another, that the services were knowingly and voluntarily accepted and that they were not gratuitously rendered." *Id.* at 133, 306 S.E.2d at 529 (citation omitted).

In the present case, Priest did not plead *quantum meruit* in his complaint, which exclusively addressed his claims based on the Agreement. The only indication in the record before us that Priest ever subsequently attempted to amend his pleadings to include a claim for *quantum meruit* is a footnote in the trial court's Order and Opinion, which states:

> A claim is limited by "admissions and allegations within their pleadings unless withdrawn, amended or otherwise altered." *Webster Enters., Inc. v. Selective Ins. Co. Se.*, 125 N.C. App. 36, 41, 479 S.E.2d 243, 247 (1997). This doctrine precludes [Priest's] efforts to assert claims for breach of oral contract[6] and *quantum meruit*, which were first raised

---

[6] Priest also argues on appeal that he was entitled to summary judgment for breach of an oral contract formed in March 2010. The gravamen of his argument here is that even though neither party could produce an executed copy of the written Agreement during discovery, the evidence in the record shows that both parties intended to be bound by the Agreement's terms and proceeded accordingly. However, Priest's complaint is devoid of any allegation that he is entitled to recover based on this theory, and

after the pleadings were closed and discovery completed.

On appeal, Priest insists that his complaint "gives notice of [his] claim for *quantum meruit* despite not labeling it as such" and that he therefore remains entitled to collect 25% of the proceeds from the sale of the patent, just as he contends the Agreement provided.

This argument fails. While Priest's failure to specifically plead *quantum meruit* is not necessarily fatal, *see Paxton*, 64 N.C. App. at 132, 306 S.E.2d at 529, we again find his reliance on *Robertson* misplaced. As noted *supra*, in *Robertson*, we recognized that a contingent fee contract for representation in litigation was unenforceable because it violated the express requirements of Rule 1.5(c) that such arrangements be in writing, but we nevertheless allowed the attorney to recover on his alternative claim in *quantum meruit* because the Rules violation was one of form, rather than content. __ N.C. App. at __, 760 S.E.2d at 320. Here, by contrast, Priest's claim arises from the Agreement, which, as explained *supra*, is not a contingent fee contract but instead a business transaction. Given that Priest failed to comply with the express requirements of Rule 1.8(a), and in light of the strong public policy considerations

---

although Priest argues in his appellate brief that the trial court erred in refusing to allow him to amend his pleadings, here again, the only indication in the record before us that Priest ever sought to amend his complaint to include such a claim comes in the form of a footnote in the trial court's Order and Opinion. In any event, we conclude that even if Priest had properly pled or amended his complaint to include a claim for breach of an oral contract, his argument that such an arrangement entitled him to summary judgment fails for the same reason as his argument based on the written Agreement fails—namely, because it is a business transaction and Priest failed to comply with the express requirements of Rule 1.8(a).

that Rule embodies, we decline to hold that Priest's failure to obtain his clients' written consent to the terms of the Agreement or advise them in writing of the desirability of seeking independent counsel were merely formal violations of our Rules of Professional Conduct.

Furthermore, Priest cites no evidence whatsoever to support the proposition that the amount he seeks to recover for the value of his services—$200,000, or 25% of the net proceeds from the sale of the patent—is "reasonable and customary for work of like kind, performed under like conditions and circumstances." *Id.* at __, 720 S.E.2d at 321. Indeed, Passe's affidavit in support of Coch and IP's motion for summary judgment demonstrates that "a commission on the sale of a patent by a third party is not a standard transaction" and that "a 25% commission for licensing a patent" is virtually unprecedented. We therefore hold that the trial court did not err in refusing to allow Priest to assert a late claim for recovery in *quantum meruit*. Accordingly, the trial court's Order and Opinion is

AFFIRMED.

Judges MCCULLOUGH and ZACHARY concur.