*John Fitzgerald, et al. v. Tatyana S. Bell, Personal Representative of the Estate of John Thurman Bell*
No. 3499, Sept. Term, 2018
Opinion by Leahy, J.

**Statute of Limitations > Accrual of Claims > Discovery Rule > Continuation of Events Theory**

As a corollary to the discovery rule, our courts recognize the "continuation of events" theory, pursuant to which the statute of limitations may be tolled when a confidential or fiduciary relationship exists between the parties. *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 97-98 (2000). Fraudulent concealment is not required to toll the statute of limitations under the continuation of events theory. Otherwise, the continuation of events theory would be subsumed by another "tangent of the discovery rule"—fraud. *Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A.*, 152 Md. App. 698, 715 (2003).

**Maryland Uniform Commercial Code > Negotiable Instruments > Statute of Limitations > Accrual of Claims > Discovery Rule**

A clear majority of jurisdictions have held that, in the absence of fraudulent concealment, the discovery rule does not apply to negotiable instruments under the Uniform Commercial Code ("UCC"). *See, e.g.*, *Hawkins v. Nalick*, 975 N.E.2d 793, 798 (Ill. App. Ct. 2012) (reviewing cases and determining that "the overwhelming majority of other jurisdictions that have addressed this issue have declined to apply the discovery rule to toll the statute of limitations for actions alleging the conversion of negotiable instruments"); *Menichini v. Grant*, 995 F.2d 1224, 1229 (3d Cir. 1993) ("Although a few courts apply the discovery rule to negotiable instrument theft on essentially equitable grounds, the tide of case law runs strongly against this approach." (footnotes omitted)).

**Maryland Uniform Commercial Code > Negotiable Instruments > Statute of Limitations > Accrual of Claims > Discovery Rule**

Two major principles underlie the majority approach: (1) the finality, predictability, and swift resolution of commercial transactions and (2) the perceptible nature of the injury at the time of conversion. *See Advance Dental Care, Inc. v. SunTrust Bank,* 906 F. Supp. 2d 442, 447-48 (D. Md. 2012) (summarizing principles underlying the majority and minority approaches).

**Maryland Uniform Commercial Code > Negotiable Instruments > Statute of Limitations > Accrual of Claims > Discovery Rule**

Unlike the situation in which a claimant may not be aware of a claim (and the discovery rule may toll the statute of limitations), the payee on a negotiable instrument may determine his or her rights by reviewing the instrument, and, in the case in which payment is due on demand, may assert his or her claim immediately.

**Maryland Uniform Commercial Code > Negotiable Instruments > Statute of Limitations > Accrual of Claims > Discovery Rule > CL § 3-118(b)**

We hold that, in the absence of fraudulent concealment, the discovery rule does not apply to toll the statute of limitations for an action to enforce a note payable on demand under CL § 3-118(b).

**Maryland Uniform Commercial Code > Negotiable Instruments > Statute of Limitations > Accrual of Claims > Notice**

JJF Management received a copy of the 1998 Note, and the 1998 Note provides that payment is due on demand. Accordingly, because JJF Management had actual knowledge of its claim under the 1998 Note, or, at a bare minimum, should have known of its claim, the existence of a confidential relationship could not serve to toll the limitations period. *See Supik*, 152 Md. App. at 714-15.

Orphans' Court for Montgomery County
Estate No. W91740

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3499

September Term, 2018

_____

JOHN FITZGERALD, ET AL.

v.

TATYANA S. BELL, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
JOHN THURMAN BELL

_____

Arthur,
Leahy,
Gould,

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  April 30, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal is from the grant of summary judgment by the Orphans' Court for Montgomery County on January 25, 2019, in favor of appellee Tatyana S. Bell, in her capacity as personal representative of the Estate of John Thurman Bell (the "Estate"). Appellants John J. Fitzgerald, Jr. and his company, JJF Management Services, Inc. ("JJF Management") (collectively, the "Fitzgerald Parties"), challenged the Estate's disallowance of their claims on two loans purportedly made to Mr. Bell in 1992 and 1998. Until his death in 2017, Mr. Bell was Mr. Fitzgerald's close friend, and he was counsel to the Fitzgerald Parties.

The orphans' court found that the claims were barred by the applicable statute of limitations notwithstanding, for purposes of summary judgment, the existence of a confidential relationship. The Fitzgerald Parties timely noted their appeal and present four issues for our review,[1] which we recast and consolidate into the following two questions:

---

[1] The Fitzgerald Parties phrased their questions presented as follows:

1. Given the Orphans' Court's finding that a confidential relationship existed between the Appellants and their attorney Bell, did the Orphans' Court commit reversible error in granting summary judgment on grounds that there was no material dispute that the Appellants knew, or should have known, that the loans were subject to collection prior to the expiration of the statute of limitations?

2. Given the Orphans' Court's finding that a confidential relationship existed between the Appellants and their attorney Bell, did the Orphans' Court commit reversible error in failing to shift the burden to the Appellee to show that attorney Bell acted with the utmost good faith and loyalty in connection with the loans, and to show that he made known to the Appellants all information that was significant and material to preserving their ability to collect the loans?

(Continued)

I.      Did the orphans' court err in finding that there were no material facts in dispute?

II.     Did the orphans' court err in granting summary judgment to the Estate due to the expiration of the applicable statute of limitations, despite finding that a confidential relationship existed between Mr. Bell and the Fitzgerald Parties?

We reverse the orphans' court's grant of summary judgment under the applicable statute of limitations on the claim relating to the 1992 Deed of Trust because the record does not establish when that claim accrued. Conversely, we affirm the grant of summary judgment in favor of the Estate on JJF Management's claim relating to the 1998 Note. In so doing, we hold that, in the absence of fraudulent concealment, the discovery rule does not apply to toll the applicable statute of limitations for an action to enforce a demand promissory note under Maryland Code (1975, 2013 Repl. Vol.), Commercial Law Article ("CL") § 3-118(b). Accordingly, we affirm, in part, and reverse, in part, the judgment of the orphans' court and remand for further proceedings consistent with this opinion.

**BACKGROUND**[2]

---

3.  Did the Orphans' Court commit reversible error in failing to toll the statute of limitations, notwithstanding attorney Bell's total failure to comply with the Rules of Professional Conduct requirements for doing business with a client and for handling client funds?

4.  May the judgment of the Orphans' Court be upheld on any ground appearing in the record?

[2] We summarize the facts in the light most favorable to the Fitzgerald Parties, the non-moving parties, and construe any reasonable inferences that may be drawn from the well-plead facts against the moving party. *Conaway v. Deane,* 401 Md. 219, 243 (2007).

2

John Thurman Bell died testate on June 17, 2017. Beginning some time prior to 1976 until his death, Mr. Bell, an attorney, rendered legal services to JJF Management and Mr. Fitzgerald, personally. JJF Management paid Mr. Bell a monthly retainer, and Mr. Fitzgerald paid Mr. Bell after legal services were rendered.

Mr. Fitzgerald deposed that he and Mr. Bell also developed a close personal friendship: they "often ate meals together on weekends, spoke on the phone often, and maintained a very happy and collegial relationship." Mr. and Mrs. Bell received regular invitations to join Mr. Fitzgerald for Thanksgiving dinner at his club.

During the course of their four-decades-long professional relationship and friendship, Mr. Bell would occasionally request loans from Mr. Fitzgerald and, according to Mr. Fitzgerald, Mr. Bell would "often repay these loans as agreed, would renegotiate the terms of the loan, or would roll the obligation into another new obligation." When Mr. Bell requested a loan, he would "always create the paperwork documenting the loan, including promissory notes, and any security interests such as deeds of trust." Between 1982 and 1989, Mr. Fitzgerald made a number of loans to Mr. Bell, and each was secured by various promissory notes to Mr. Fitzgerald. Mr. Bell had paid off a number of these loans during this seven-year period.

According to Gregg J. Steinbarth, an attorney who worked for Mr. Bell and his law firm and is currently General Counsel of JJF Management, "[b]y October of 1992, the amount owed by Mr. Bell to Mr. Fitzgerald totaled somewhere between $235,000 to $305,000." The parties decided to consolidate the debt, extend the time for repayment, and secure the debt with a Deed of Trust on Mr. Bell's real property.

3

## The 1992 Deed of Trust

On October 10, 1992, Mr. Bell executed a "Money Loaned Deed of Trust" ("1992 Deed of Trust") in favor of John J. Fitzgerald, Jr. as security for debt owed to Mr. Fitzgerald in the amount of $255,000.00 plus accrued interest.[3] The 1992 Deed of Trust was "prepared under the supervision of Robert T. Wilson, an attorney duly admitted to practice before the Court of Appeals of the State of Maryland." The 1992 Deed of Trust provides:

> This debt is evidenced by Borrower's note* dated the same date as this Security Instrument [], which provides for monthly payments, with the full debt, if not paid earlier, due and payable on the day and year as set forth in the note.

The asterisk typed by the phrase "Borrower's note" was retyped below with the following clarification: "The borrower has executed and delivered his four promissory notes payable in accordance with the specific terms as set forth herein." Neither the Estate nor Mr. Fitzgerald produced the four promissory notes referenced in the Deed of Trust or testified as to their content before the orphans' court. The Deed of Trust identified four parcels of land at Washington Grove Shopping Center, 105-117 Laytonsville Road, as the security conveyed to the trustee for the notes. Stephen J. Beck was present at the execution of the Deed of Trust and, as Mr. Fitzgerald's agent, "made oath in due form of law that the consideration recited in said Deed of Trust is true and bona fide as therein set forth." Mr. Bell allegedly never paid Mr. Fitzgerald any amounts on the note or notes secured by the 1992 Deed of Trust. Mr. Fitzgerald never demanded payment.

---

[3] At his deposition, Mr. Fitzgerald could not recall the specifics of the loan, and could not recall whether Mr. Bell signed a written promissory note in connection with the 1992 loan.

4

**The 1998 Note**

On July 8, 1998, JJF Management loaned Mr. Bell the sum of $281,649.00, as reflected in a "Confessed Judgment Note" ("1998 Note"). The 1998 Note provides:

> FOR VALUE RECEIVED, the undersigned, JOHN T. BELL, promises to pay to the order of JJF MANAGEMENT SERVICES, INC., the principal sum of Two Hundred Eighty One Thousand Six Hundred Forty Nine Dollars ($281,649.00) and accruing interest at the rate of 11.9%. Said principal and final interest payment to be due and owing upon demand.

Mr. Bell allegedly never paid JJF Management any amounts on the 1998 Note, and JJF Management never demanded payment.

In his affidavit submitted in the orphans' court, Mr. Fitzgerald attested that, for the 1992 Deed of Trust, the 1998 Note, and any other loan obligations:

> I always placed total trust and confidence in Mr. Bell. He was not only my attorney but also my close personal friend. I expected him to advise me concerning the many on-going loans I and [JJF Management] had made to him. I counted on Mr. Bell to keep the loans separate and to keep a proper accounting of payments made. I also expected Mr. Bell to advise of any events that would prejudice my or [JJF Management]'s interests with respect to the loans.

**The Estate**

On June 26, 2017, Mr. Bell's Last Will and Testament, dated December 20, 2014, was filed in the Office of the Register of Wills for Montgomery County. Mrs. Bell was named as personal representative of Mr. Bell's estate.

On October 31, 2017, Mr. Fitzgerald filed a claim against the Estate in the amount of $927,823.57, based on the 1998 Note. On March 12, 2018, JJF Management filed a

"Corrected & Amended Claim Against Decedent's Estate" ("JJF Management Claim"), correcting and certifying that the proper claimant was JJF Management, rather than Mr. Fitzgerald, and that the actual sum due and owing pursuant to the Note was actually $916,980.75.[4]

Also, on October 31st, Mr. Fitzgerald filed another claim against the Estate in the amount of $828,750.00, based on the 1992 Deed of Trust ("Fitzgerald Claim").[5]

Mrs. Bell, in her capacity as personal representative of the Estate, filed notices of disallowance against the entire $927,823.57 and $828,750.00 claimed by Mr. Fitzgerald on December 1st. In response, on January 8, 2018, Mr. Fitzgerald filed petitions for allowance of the JJF Management Claim and the Fitzgerald Claim.

### Summary Judgment

On September 27, 2018, the Estate filed a motion for summary judgment on the Fitzgerald Claim and the JJF Management Claim on the grounds that both claims were barred by the applicable statute of limitations. The Estate averred that "it is undisputed that both claims, one 20 years old and a second 25 years old, are barred by the applicable statutes of limitations[.]" In its statement of undisputed facts, the Estate alleged that in

---

[4] The amount claimed includes the unpaid principal balance of $281,649.00 and $635,331.75 in accrued interest from July 9, 1998, the date of the execution of the 1998 Note, through June 17, 2017, the date of Mr. Bell's death, calculated at the rate of 11.9% per annum on the unpaid principal.

[5] It is a mystery, on this record, how the Fitzgerald Parties were able to calculate the interest without the notes.

regard to the JJF Management Claim, Mr. Fitzgerald: "does not recall the circumstances of the promissory note"; "does not know if he had ever seen the Note"; "does not know whether Mr. Bell made a payment"; and "does not know (a) if JJF [Management] or [Mr. Fitzgerald] made a demand for payment. . . (b) if anyone else at JJF [Management] made a demand for payment and (c) if he ever discussed the note with decedent Bell." Regarding the Fitzgerald Claim, the Estate averred that Mr. Fitzgerald: "does not remember if he or JJF [Management] made a loan to decedent Bell for $255,000 in approximately 1992"; "does not remember if decedent signed a written promissory note for the loan or loans on which the Fitzgerald Claim is based"; "does not know and does not remember if decedent made a payment on any loan for up to $255,000 reflected by the Fitzgerald Claim" or "if a demand for repayment was ever made."[6]

The Estate argued that the Fitzgerald Claim was barred by the three-year statute of limitations. Because Mr. Fitzgerald does not recall whether the loan was made to Mr. Bell in 1992 or whether Mr. Bell had signed any note in connection with the Deed of Trust, according to the Estate, "at best the Fitzgerald Claim alleges an unpaid loan to decedent made on or about October 10, 1992," which accrued at that date. According to the Estate, the Fitzgerald Claim was time-barred because it was not filed by October 10, 1995.

---

[6] At oral argument, counsel for the Estate was unaware whether the debt was satisfied in whole or in part.

(Continued)

7

The Estate also argued that the JJF Management Claim was barred by the ten-year limitations period for collection of a note under CL § 3-118(b).[7] JJF Management did not demand payment, and Mr. Bell never made payment, within ten years after the 1998 Note was signed as required to toll the limitations period.

The Fitzgerald Parties opposed the Estate's summary judgment motion primarily on two grounds.[8] First, the Fitzgerald Parties argued that material questions of fact existed concerning when the Fitzgerald Claim accrued. Because the Estate failed to present any "evidence that the term of any of the four notes is less than 30 years," the Estate could not show that any of the notes referenced in the 1992 Deed of Trust were breached. Second, regarding both the Fitzgerald Claim and the JJF Management Claim, the Fitzgerald Parties asserted that the existence of a confidential relationship between Mr. Bell and the

---

[7] The statute provides, in pertinent part:

> [I]f demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within 6 years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of 10 years.

CL § 3-118(b).

[8] The Fitzgerald Parties also argued that Maryland Dead Man's Statute, Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 9-116, did not bar the affidavits of Mr. Steinbarth or Mr. Fitzgerald, or the deposition testimony of Mr. Fitzgerald. The Estate denied that the Personal Representative "has waived her ability to invoke the Dead Man's Statute in this action" but argued that "the issue need not be reached by the [c]ourt because no statement of the decedent is material to the motion for summary judgment." The orphans' court did not reference or determine the admissibility of this evidence pursuant to CJP § 9-116 in rendering its decision to grant summary judgment.

8

Fitzgerald Parties generated a dispute of material fact regarding whether the claims were tolled. Relying primarily on *Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76 (2000), the Fitzgerald Parties averred that "Mr. Bell owed a duty to Mr. Fitzgerald to disclose all information that was significant and material to the matter that was the subject of the relationship," including an affirmative duty to "return Mr. Fitzgerald's money" and to inform him when the statute of limitations was about to expire.

In reply, the Estate pressed that the Fitzgerald Parties failed to generate a dispute of material fact as to the applicable statute of limitations. Regarding the Fitzgerald Claim, the Estate argued that Mr. Fitzgerald could not impermissibly shift the burden of proof to the Personal Representative by claiming that the notes at issue may have had a 30-year term. Because Mr. Fitzgerald did not produce a note to extend the statute of limitations beyond October 10, 1995, according to the Estate, the Fitzgerald Claim was barred by limitations. Likewise, the Estate averred that, because the Fitzgerald Parties conceded that neither a payment nor a demand for payment was made during a continuous ten-year period, the JJF Management Claim is time-barred.

Regarding the Fitzgerald Parties' argument that the statutes of limitations were tolled due to the existence of a confidential relationship, the Estate averred: "As an initial matter, there is no genuine factual dispute that would show that decedent had a confidential relationship with either claimant as to the loan purportedly made on or about October 10, 1992, or the Confessed Judgment Note dated July 8, 1998." Also, the Estate argued that "there is no factual dispute that any conduct by Bell concealed the fact that either claimant had made a loan that was unpaid." The Estate concluded:

9

[T]he reasons for the statute of limitations are illustrated by the two claims that JJF [Management] and Fitzgerald have filed against the Estate of decedent. Claimants waited almost 20 years, in the case of the JJF [Management] claim, and 25 years in the case of the Fitzgerald Claim to pursue their claims. Mr. Bell, the decedent, died on June 17, 2017. Claimants waited only until after Mr. Bell's death to file these claims, knowing the Estate would be prejudiced by the extraordinary delays and the fact that Mr. Bell, the person who could have disputed them, is unable to defend against the claims. Accordingly, Mrs. Bell, as Personal Representative of the Estate, is entitled to summary judgment[.]

On January 25, 2019, the orphans' court held a hearing on the Estate's motion for summary judgment. Counsel for the Estate argued that there was no dispute that applicable statute of limitations had run years ago. Counsel averred that "unless there's a material factual dispute over fraudulent concealment here, there's no basis for avoiding the statute of limitations." Because there was no concealment or any other exception to toll the statute of limitations, summary judgment was appropriate.

Counsel for the Fitzgerald Parties argued that "numerous disputed questions of both law and fact" precluded summary judgment, and that fraudulent concealment is not the only exception that tolls the statute of limitations. Referencing *Frederick Road*, counsel argued that the existence of a special relationship could also toll the statute. The court then inquired, "accepting [the Fitzgerald Parties' averments] for the sake of argument," whether there would have to be a nexus between the relationship and the loans, and observed that "if [Mr. Bell]'s representing [the Fitzgerald Parties] on his car dealerships, that's got nothing to do with their personal back and forth loans." In response, counsel for the Fitzgerald Parties proposed that Rule 1.8 of the Maryland Rules of Professional Conduct addresses the issue by establishing the standard of conduct an attorney must employ when

10

entering into a business transaction with a client. According to counsel, the Rule "goes to establish whether . . . Mr. Bell was in a confidential relationship[.]" Counsel urged that, due to the ongoing attorney-client relationship between Mr. Bell and the Fitzgerald Parties, the Fitzgerald Parties—rather than being required to understand the terms of the loan and make a demand—could rely simply on Mr. Bell's promise to repay the loan.

Ruling from the bench, the orphans' court judge granted summary judgment in favor of the Estate:

> Even assuming, for the sake of the summary judgment issue, that there was an ongoing confidential relationship up until or close to Mr. Bell's death, the Court sees no nexus between the relationship and the failure of the lending party claimants here, to know or should have known that he or it had a right to proceed to execute on the -- to collect, rather, on the loans. There was, the Court finds, no material dispute of fact -- of a genuine dispute on the issue of due diligence or that it was known, or it should have been known that there was a loan that – or loans that were subject to collection.
>
> . . . .[I]t's clear to the Court and undisputed, as I see the record, that there was a conscious decision, let alone a lacking of diligence[,] to [decline to] proceed with the rights that the lender had to pursue payment of the loan.

The orphans' court then memorialized its ruling in a written order on January 25, 2019. Specifically, the order disallowed the JJF Management Claim and the Fitzgerald Claim and dismissed the petitions for allowance with prejudice. The Fitzgerald Parties noted a timely appeal to this Court.

## DISCUSSION

## I.

## STANDARD OF REVIEW

11

We review the orphans' court's grant of summary judgment without deference. *Koste v. Town of Oxford*, 431 Md. 14, 25 (2013) (quoting *D'Aoust v. Diamond*, 424 Md. 549, 574 (2012)). Summary judgment is proper where the lower court determines that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2-501.[9] "In this regard, the standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct." *Beatty v. Trailmaster Prod., Inc.*, 330 Md. 726, 737 (1993).

As such, in reviewing a grant of summary judgment, we review the record independently to determine whether the parties "generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law." *Charles Cty. Comm'rs. v. Johnson*, 393 Md. 248, 263 (2006) (citation omitted). "We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party." *Id*.

While a party may defeat summary judgment by demonstrating a triable issue of material fact, the "mere existence of a scintilla of evidence in support of the plaintiffs' claim is insufficient to preclude the grant of summary judgment; there must be evidence upon which the jury could reasonably find for the plaintiff." *Hamilton v. Kirson*, 439 Md. 501, 523 (2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Further, "[i]t is a settled principle of Maryland appellate procedure

---

[9] Maryland Rule 6-461 provides: "Rule 2-501 applies to a proceeding in the orphans' court."

12

that ordinarily the appellate court will review a grant of summary judgment only upon the grounds relied upon by the trial court." *Id.* (citation omitted).

## II.

## A. The Parties' Contentions

The Fitzgerald Parties argue that, while the orphans' court "properly found that a confidential relationship . . . existed for summary judgment purposes, the [o]rphans' [c]ourt utterly failed . . . to determine when their causes of action accrued." According to the Fitzgerald Parties:

> First, the [o]rphans' [c]ourt failed to shift the burden to the Appellee to show that the Appellants *had actual knowledge* that the confidential relationship was being abused, or were in possession of facts that would disclose such an abuse. . . . With regard to the duty of inquiry, the [o]rphans' [c]ourt ignored that the Appellants *had no duty of inquiry at all* unless something suspicious occurred. . . .

> Second, the [o]rphans' [c]ourt failed to consider whether Mr. Bell acted "with the utmost good faith and loyalty, which includes making known to the client all information that is significant and material to the matter that is the subject of the relationship." There is no evidence anywhere in the record that would indicate that Decedent Bell had acted with utmost good faith and loyalty towards the Appellants as it pertains to these debts.

(Emphasis in original.) Also, because the Estate failed to produce the note, or notes, referenced in the 1992 Deed of Trust, the Fitzgerald Parties argue that Mr. Fitzgerald had no basis "to know the term of the note, or notes – whether for three years, or thirty years" and, correspondingly, there is no "evidence in the record that [Mr.] Fitzgerald had actual knowledge that any note was due."

Relying on Rule 1.8 of the Maryland Rules of Professional Conduct, the Fitzgerald Parties aver that Mr. Bell's failure to comply with the Rules "is itself a breach of the utmost

13

good faith and loyalty that would toll limitations." Because Mr. Bell was the Fitzgerald Parties' "agent charged with overseeing the loan," the Fitzgerald Parties "rightfully expected him to take all necessary steps to preserve their claims, even though he also was the obligor of the loans."

The Estate counters that the Fitzgerald Parties' argument for tolling based on the discovery rule is "without merit." First, the Estate avers that the Fitzgerald Parties "knew or should have known the facts on which their claims were made" when each loan was extended. Second, relying on *Advance Dental Care, Inc. v. SunTrust Bank*, 906 F. Supp. 2d 442, 450 (D. Md. 2012), the Estate argues that the discovery rule does not apply to the JJF Management Claim under the statute of limitations as set forth in the Maryland Uniform Commercial Code ("Maryland UCC"). The Estate further avers that there is no "genuine factual dispute that would show that decedent had a confidential relationship" with the Fitzgerald Parties as to the Fitzgerald Claim or the JJF Management Claim. According to the Estate, the Fitzgerald Parties offered no facts to "justify their failure to prosecute either claim for years," including an alleged failure to discover the facts on which their claims were based.

Also, the Estate has several responses to the Fitzgerald Parties' contention that, pursuant to the attorney-client relationship, Mr. Bell had an ongoing duty to advise the Fitzgerald Parties of the impending expiration of the statute of limitations. First, the Estate avers that the Fitzgerald Parties "failed to establish a material factual dispute in support of their allegations that Bell represented Fitzgerald and JJF [Management] in connection with the loans on which their claims were based." Second, the Estate argues, in the alternative,

14

that even if Mr. Bell owed a duty to warn the Fitzgerald Parties of the impending expiration of the statute of limitations, his negligence did not toll the statute of limitations. Third, relying on *Crowder v. Master Financial, Inc.*, 176 Md. App. 631, 660 (2007), the Estate asserts that the Fitzgerald Parties' argument provides no basis to toll the statute of limitations because it is "based upon lack of knowledge of the law, not facts."

## B. Applicable Statutes of Limitations

Statutes of limitations "ensure fairness to defendants by encouraging promptness in bringing claims, thus avoiding problems that may stem from delay, such as loss of evidence, fading of memory, and disappearance of witnesses." *Hecht v. Resolution Tr. Corp.*, 333 Md. 324, 333 (1994). As "statutes of repose," statutes of limitations permit "the ability to plan for the future without the indefinite threat of potential liability." *Id.* Accordingly, our courts maintain a rule of strict construction regarding the tolling of the statute of limitations:

> Absent legislative creation of an exception to the statute of limitations, we will not allow any "implied and equitable exception to be engrafted to it."

*Id.* (quoting *Booth Glass Co. v. Huntingfield Corp.*, 304 Md. 615, 623 (1985)).

Generally, "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 5-101. Section 3-118(b) of the Commercial Law Article provides a different time for demand promissory notes: six years after a demand for payment or ten years without a demand if no payment was made. Specifically,

the provision of the statute relevant to the claim on the 1998 Note states: "If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of 10 years." CL § 3-118(b).

Because the legislature did not define the term "accrue" under CJP § 5-101, "the question of accrual is left to judicial determination." *Hecht*, 333 Md. at 333 (citations omitted). "It is settled that a cause of action for breach of contract accrues, and the limitations period begins to run, when a plaintiff knows or should have known of the breach." *Samuels v. Tschechtelin*, 135 Md. App. 483, 541 (2000) (citing *Vigilant Ins. Co. v. Luppino*, 352 Md. 481, 489 (1999)). It is further established that the statute of limitations applies to knowledge of facts:

> Knowledge of *facts*, however, not actual knowledge of their legal significance, starts the statute of limitations running. . . . The discovery rule, in other words, applies to discovery of *facts*, not to discovery of *law*. Knowledge of the law is presumed. . . . If plaintiffs remain unaware of their legal rights after notice of injury, the statute of limitations sets an absolute deadline for gaining awareness.

*Moreland v. Aetna U.S. Healthcare, Inc.*, 152 Md. App. 288, 297 (2003) (citations omitted).

Like any other fact-dependent issue, "if there is any genuine dispute of material fact as to when the plaintiffs possessed that degree of knowledge, the issue is one for the trier of fact to resolve; summary judgment is inappropriate." *Bank of New York v. Sheff*, 382 Md. 235, 244 (2004); *see also Doe v. Archdiocese of Wash.*, 114 Md. App. 169, 178 (1997) ("When the viability of a statute of limitations defense hinges on a question of fact . . . the factual question is ordinarily resolved by the jury, rather than by the court."). However,

16

when there is no such dispute, summary judgment is, indeed, appropriate. *Sheff*, 382 Md. at 244.

The parties agree that the general three-year statute of limitations, CJP § 5-101, applies to the Fitzgerald Claim relating to the 1992 Deed of Trust[10] and that the ten-year statute of limitations applicable to demand promissory notes, CL § 3-118(b), governs the JJF Management Claim relating to the 1998 Note. However, the parties have not attempted to establish when the notes referenced in the 1992 Deed of Trust became due and diverge as to the impact of Mr. Bell's relationship with the Fitzgerald Parties on the tolling of the statute of limitations. Accordingly, the contention on appeal relates to when the Fitzgerald Parties' claims accrued.

## C. Accrual of Claims

The Court of Appeals has adopted the discovery rule to determine the date of accrual, in recognition of the inherent unfairness of "charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury[.]" *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95 (2000). The Court has explained the discovery rule and the required inquiry notice as follows:

> [A] cause of action accrues only when a claimant knows or should know of the wrong. . . . [A claimant reasonably should know of a wrong if the claimant has] "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [to charge the individual] with notice of all

---

[10] We observe that without the notes referenced in the 1992 Deed of Trust (or clarifying evidence), the record provides no information about the notes. For example, it is unknown whether one or both of the notes were under seal. Consequently, not only is it not possible to discern the date on which the Fitzgerald Claim accrued, it is also not possible to discern the applicable statute, or statutes, of limitations that govern the notes at issue.

17

facts which such an investigation would in all probability have disclosed if it had been properly pursued."

*Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 445 (2000) (quoting *Poffenberger v. Risser*, 290 Md. 631, 637 (1981)).

As a corollary to the discovery rule, our courts recognize the "continuation of events" theory, pursuant to which the statute of limitations may be tolled when a confidential or fiduciary relationship exists between the parties. *Frederick Rd.*, 360 Md. at 97-98. When a relationship, built on trust and confidence, develops between parties, the confiding party may rely upon the "good faith of the other party so long as the relationship continues to exist." *Id.* at 98. "The confiding party, in other words, is under no duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious." *Id.*

Still, a confiding party cannot assert blind ignorance and trigger the application of the doctrine as the Court underscored in *Frederick Road.*:

> The result is different, however, if the confiding party acquires actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or comes into possession of facts which put him or her upon inquiry notice, which, if pursued, would have disclosed the abuse. In that event, the applicable statute of limitations runs from the time the confiding party receives actual knowledge or the facts which placed him or her upon inquiry notice.

*Id.* at 99-100. A potential plaintiff "is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the inquiry." *Dual, Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 169 (2004) (citation omitted). "Notwithstanding the confidential relationship, if the confiding party knows, or reasonably

18

should know, about a past injury, accrual for statute of limitations purposes will begin on the date of inquiry notice, and not the completion of services." *Supik*, 152 Md. App. at 714-15.

In *Frederick Road*, the Kings retained an attorney and acquaintance of Mr. King since high school, R. Edwin Brown, to advise them about transferring the property at issue to their children. 360 Md. at 81-82. They also sought advice on the issue from an attorney at another law firm. *Id.* at 81. The two attorneys disagreed about the proper method to value the property. *Id.* at 82. The Kings ultimately followed Mr. Brown's advice and transferred the property to their children for the amount recommended by Mr. Brown, despite the other attorney's concerns about the future tax complications of the transfer, which he explained in a letter to the Kings. *Id.* After the Kings died, the IRS initiated an investigation into the property transfer and issued a deficiency assessment against the property for more than $68 million in penalties and taxes. *Id.* at 84. While Mr. Brown assured the King children that they would prevail in court against the IRS, he changed course when he learned that the IRS had a copy of the other attorney's letter to the Kings. *Id.* at 85-86. Mr. Brown advised the children to hire counsel to sue the other attorney for malpractice arising from a breach of attorney-client privilege. *Id.* at 87. Ultimately, the circuit court entered summary judgment on behalf of the other attorney, and the King children discharged Mr. Brown as their attorney. *Id.* at 88.

Less than three years after discharging Brown, but more than seven after settling with the IRS, the King children sued Brown for malpractice. *Id.* at 88-89. The circuit court granted summary judgment in favor of Mr. Brown, and a divided panel of this Court

19

affirmed. *Id.* at 89. The Court of Appeals then reversed. *Id.* at 80. The Court of Appeals reasoned that, in light of the "continuous, confidential relationship" with Mr. Brown, until the dismissal of their malpractice claim against the other attorney, the King children were "under no duty to make inquiries about the quality or bona fides of the services received [from Mr. Brown], unless and until something occur[ed] to make [them] suspicious." *Id.* at 98. Mr. Brown and his law firm had "dominated the property transaction, the tax litigation, and the malpractice litigation against [the other attorney]" and repeatedly assured the Kings that the property transaction was legitimate and would be upheld. *Id.* at 104. Consequently, a finder-of-fact could conclude that sifting through this problem to determine that Mr. Brown had provided negligent advice would require the use of diligence not required under Maryland law. *Id.* at 104-06. The Court observed:

> [R]easonable minds could conclude that, to require the [King children] in this circumstance, while [Mr. Brown] continued to represent them, not only to be suspicious of their lawyers, but to ferret out, by seeking yet more legal advice than that being obtained from [the lawyers working on their case], every possibility that their lawyers may have provided negligent advice, or that they were being defrauded, would amount to the exercise of extraordinary diligence, rather than the usually required, usual or ordinary diligence.

*Id.* at 105-06. Accordingly, the Court of Appeals held that summary judgment was inappropriate. *Id.* at 80.

The Estate, on the other hand, relies on *Johns Hopkins Hospital v. Lehninger*, 48 Md. App. 549 (1981), and asserts that fraudulent concealment is required to toll the statute of limitations. In *Lehninger*, we reversed a jury verdict for the plaintiff on the grounds that the circuit court had incorrectly allowed the case to go to the jury without sufficient evidence of fraud to toll the statute of limitations. *Id.* at 568. We determined:

20

> Our examination of Maryland law leads us to conclude that the defense of limitations can only be barred by a defendant's fraud or conduct tantamount to constructive fraud. Negligence alone cannot estop a negligent party from asserting the defense of limitations.

*Id.* at 561. A confidential relationship was not present in *Lehninger*, and we, correspondingly, did not address the continuation of events theory.

In *Lehninger*, the plaintiff claimed that his doctors at Johns Hopkins Hospital had failed to diagnose avascular necrosis following an injury to his hip, despite assuring the plaintiff that he did not have this condition. *Id.* at 553. It was undisputed that the plaintiff discovered the doctors' alleged negligence days later when he sustained a fracture but failed to file a complaint until years later. *Id.* at 553-55. The trial judge—believing that the case turned on whether it would be fair to allow the Hospital to rely on limitations given the Hospital's assurances—allowed the jury to consider whether the Hospital's negligent conduct could estop the defense of limitations. *Id.* at 563. The jury then returned a verdict in favor of the plaintiff. *Id.* at 560. In reversing the judgment of the circuit court, we held that "when a professional practitioner renders an erroneous opinion to his patient or client, and proceeds in good faith to act on the basis of that opinion, a subsequent showing of negligence alone will not preclude the practitioner from raising a defense of limitations." *Id.* at 568.

Because the continuation of events theory was not at issue in *Lehninger*, the Estate's reliance on that case is misplaced. We need to search no further than *Frederick Road* to find a case in which negligent concealment was sufficient to toll the statute of limitations. *Frederick Rd.*, 360 Md. at 115 ("[A] rational jury could have concluded that the

21

respondents, who maintained an attorney-client relationship with the petitioners from 1981 to 1994, took advantage of the confidential relationship they had with the petitioners by failing to inform them of their potential liability, thereby preventing or delaying discovery of the respondents' initial alleged negligence, despite the petitioners exercise of ordinary diligence."). If the Estate were correct that fraudulent concealment was necessary to toll the statute of limitations, the continuation of events theory would be subsumed by another "tangent of the discovery rule"—fraud. *Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A.*, 152 Md. App. 698, 715 (2003).

Fraud will also suspend the accrual date under CJP § 5-203. The statute provides: "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." CJP § 5-203. "[B]y its own terms, § 5-203 is made to apply to those cases where two conditions are met: (1) the plaintiff has been kept in ignorance of the cause of action by the fraud of the adverse party, and (2) the plaintiff has exercised usual or ordinary diligence for the discovery and protection of his or her rights." *Frederick Rd.*, 360 Md. at 98-99 (citation omitted). The Court of Appeals instructed in *Frederick Road* that:

> Consistent with the continuation of events theory and the General Assembly's intention that the statute of limitations for fraud be tolled . . . where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may toll the statute of limitations, if: (1) the relationship continues unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting the fraud.

*Id.* at 99 (citation omitted).

22

We have noted the obvious point that "the date of accrual for an independent cause of action cannot be any earlier than the date(s) of the actual injury." *Supik*, 152 Md. App. at 716. Actions accrue "when the wrong is discovered or when with due diligence it should have been discovered[.]" *Id.* at 717 (emphasis in original) (quoting *James v. Weisheit*, 279 Md. 41, 45 n.4 (1977)). And more recently, in a case in which scienter was an element of the cause of action, we re-emphasized the principle that inquiry notice is all that is required. *See Estate of Adams v. Cont'l Ins. Co.*, 233 Md. App. 1, 32 (2017) ("Inquiry notice is triggered when the plaintiff recognizes, or reasonably should recognize, a harm—not when the plaintiff can successfully craft a legal argument and not when the plaintiff can draft an unassailable and comprehensive complaint."). Accordingly, in regard to the underlying case, "we are confronted with two inquiries: (1) was there a legal cause of action, and if so, when did that occur?; and (2) . . . was the accrual date tolled beyond [the conclusion of the limitations period] based on one of the tolling provisions discussed?" *Supik*, 152 Md. App. at 716.

### D. Analysis

As the above authorities direct, we first ascertain whether there actually is a viable legal cause of action for breach of the two loans and whether a dispute of material fact exists as to when the action accrued.

#### *1992 Deed of Trust*

As addressed above, a legally cognizable cause of action for breach of contract requires that a breach actually occur. *Samuels*, 135 Md. App. at 541. We cannot determine,

23

based on the record below, whether a breach of the notes referenced in the 1992 Deed of Trust occurred by the time the Fitzgerald Parties filed their claim because none of the notes have been produced by either party. Given the lapse of time, it is, perhaps, unsurprising that the parties have no recollection of when the notes referenced in the 1992 Deed of Trust became "due and payable." However, due to this lapse in recollection and the absence of documents referenced in the 1992 Deed of Trust, we cannot determine when the Fitzgerald Claim accrued.

The Estate avers that Mr. Fitzgerald "knew of the amount of the loan and its terms for repayment." The Estate also asserts: "speculation that there may have been a note . . . does not allow [Mr.] Fitzgerald to rely on an alleged note or notes that he does not possess." Again, without the notes referenced in the 1992 Deed of Trust (or clarifying evidence), we cannot determine their terms and whether Mr. Fitzgerald's claim is time-barred. While we must remand to the orphans' court for further proceedings, we note that, under long-settled law, "the law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms." *Merit Music Services, Inc. v. Sonneborn*, 245 Md. 213, 221-22 (1967). Mr. Fitzgerald cannot claim that he was justified in relying on Mr. Bell to inform him of the loan's contents, when he and his agent, Stephen J. Beck, should have known both the amount of the loan and its repayment terms at its execution date.

Accordingly, we hold that the grant of summary judgment on statute of limitations grounds was improper as to the 1992 Deed of Trust because the record does not establish when the Fitzgerald Claim accrued. Quite simply, nothing in the record indicates when the

24

note or four notes referenced in the 1992 Deed of Trust became due, or even whether they had become due before Mr. Bell passed away.

### *1998 Note*

By its terms, the 1998 Note provides that the "principal and final interest payment" is "due and owing upon demand."  JJF Management, therefore, had the right to demand payment at any time after July 8, 1998, the effective date of the 1998 Note.  While we cannot ascertain whether a claim relating to the 1992 Deed of Trust had accrued, the 1998 Note's provisions clarify exactly when JJF Management was legally entitled to payment: upon demand.  Further, § 3-118(b) of the Commercial Law Article is clear that if no demand for payment is made and payment is not likewise made on the principal or the interest on the note for a continuous ten-year period, an action to enforce the note is time-barred.  It is undisputed that Mr. Bell never paid JJF Management any amount on the 1998 Note, and JJF Management never demanded payment.  Consequently, unless tolled, the JJF Management Claim must have been filed by 2008.

### *Negotiable Instruments and the Discovery Rule*

The Fitzgerald Parties maintain that the discovery rule applies to the 1998 Note because, as set forth in *Poffenberger v. Risser*, 290 Md. 631, 635 (1981), the "discovery rule applies to *all* civil actions."  The Estate disputes this contention, claiming that the discovery rule does not apply to demand notes governed by CL § 3-118(b).  The statute is silent on this point, and neither party has cited, nor have we found, a case analyzing the discovery rule in an action to enforce a note payable on demand pursuant to CL § 3-118(b).  Faced with this question of first impression, we consider the policies marshalled under the

25

Maryland UCC and the Uniform Commercial Code ("UCC") on which the Maryland statutory scheme is modeled.[11] As well, we review the decisions of our sister states that have considered whether the discovery rule applies to negotiable instruments under similar versions of UCC section 3-118.

The General Assembly instructs that the "Maryland [UCC] shall be liberally construed and applied to promote its underlying purposes and policies." CL § 1-103(a). These "purposes and policies" include:

(1) To simplify, clarify, and modernize the law governing commercial transactions;

(2) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; and

(3) To make uniform the law among the various jurisdictions.

CL § 1-103(b).

Many federal and state courts have interpreted § 3-118 of the Maryland UCC in the context of negotiable instrument theft under subsection (g), which covers "warranty and conversion cases and other actions to enforce obligations or rights arising under Article 3."

---

[11] The General Assembly first adopted the Maryland version of the UCC in 1963 by Chapter 538 of the Acts of 1963, codified as Article 95B of the Maryland Code. 1963 Md. Laws, ch. 538 (S.B. 77). Title 3 of the Commercial Law Article, governing negotiable instruments, was enacted in 1996 and took effect on January 1, 1997. 1996 Md. Laws, ch. 91 (S.B. 40). The only substantive change to CL § 3-118 was an amendment to subsection (e) in 2006 to "establish[] a [] limitations period on actions to enforce an obligation of a depository institution to pay certain certificates of deposit[.]" 2006 Md. Laws, ch. 535 (S.B. 747).

(Continued)

CL § 3-118(b), cmt. 6.[12]  A clear majority of jurisdictions have held that, in the absence of fraudulent concealment,[13] the discovery rule does not apply to negotiable instruments under the UCC.  *See, e.g.*, *Hawkins v. Nalick*, 975 N.E.2d 793, 798 (Ill. App. Ct. 2012) (reviewing cases and determining that "the overwhelming majority of other jurisdictions that have addressed this issue have declined to apply the discovery rule to toll the statute of limitations for actions alleging the conversion of negotiable instruments"); *Menichini v. Grant*, 995 F.2d 1224, 1229 (3d Cir. 1993) ("Although a few courts apply the discovery rule to negotiable instrument theft on essentially equitable grounds, the tide of case law runs strongly against this approach." (footnotes omitted)).[14]

---

[12] Official comments to the UCC are provided by the National Conference of Commissioners on Uniform State Laws, who drafted the UCC and other uniform model statutes for adoption by state legislatures.  *Thompkins v. Mountaineer Invs., LLC*, 439 Md. 118, 136 n.16 (2014).  "[W]hile not controlling authority, 'they are an excellent place to begin a search' for legislative intent."  *Id.* (citing *Jefferson v. Jones*, 286 Md. 544, 548 (1979)).

[13] As we address below, the discovery rule is not applicable to UCC conversion claims or to claims under CL § 3-118(b) because, in both instances, the payee is well-positioned to detect the claim.  However, if a defendant successfully conceals facts necessary for the payee to know that a claim even exists, despite the payee's diligence, *Frederick Rd.*, 360 Md. at 98-99, our sister courts, without consistently articulating this rationale, have declined to hold the payee responsible for the injury when the payee is unable to detect his or her claim due to another's conduct, *see Hawkins v. Nalick*, 975 N.E.2d 793, 799 (Ill. App. Ct. 2012).  We agree with this approach.

[14] The minority of jurisdictions that have applied the discovery rule to UCC conversion claims have relied principally on the fact that their state courts consistently favored its application to commercial disputes and other causes of action.  *See, e.g.*, *Stjernholm v. Life Ins. Co. of N. Am.*, 782 P.2d 810, 811 (Colo. App. 1989) (applying the discovery rule to a conversion claim under the UCC because Colorado courts "have consistently favored the date of discovery rule for numerous causes of action").  However, as the federal district court explained in *Advance Dental Care*:

(Continued)

27

In *Advance Dental Care, Inc. v. SunTrust Bank*, an office administrator of a general dental practice stole over $400,000 by taking insurance reimbursement checks payable to the practice, endorsing the checks to herself, and then depositing them into her personal account at SunTrust Bank. 906 F. Supp. 2d 442, 443-44 (D. Md. 2012). The office administrator continued this theft for over three years until the practice became aware of the administrator's conduct and terminated her employment in October of 2007. *Id.* at 443. The dental practice filed suit against SunTrust Bank for conversion under the Maryland UCC on April 21, 2010, and SunTrust moved for partial summary judgment on any checks converted outside of the three-year limitations period. *Id.* at 444. The federal district court reviewed a cause of action for conversion and explained that the Maryland UCC "provides that '[a]n instrument is . . . converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.'" *Id.* at 445 (quoting CL § 3-420(a)). Section 3-118(g) further states that "an action . . . for conversion of an instrument, for money had and received, or like action based on conversion . . . must be commenced within 3 years after the cause of action accrues."

the fact that the discovery rule is applied to other civil actions pursuant to [CJP] § 5-101 does not automatically warrant its application to [CL] § 3-118(g) of the UCC. Indeed, courts following the majority approach have done so despite the relevant state courts' application of the discovery rule to several other causes of action, including those to which Maryland courts have applied the rule.

906 F. Supp. 2d at 448 (collecting cases). Also, § 5-101 of the Courts and Judicial Proceedings Article does not apply when "another provision of the Code provides a different period of time within which an action shall be commenced." CJP § 5-101.

*Id.* (quoting CL § 3-118(g)). Because SunTrust claimed that most of the funds were converted before 2007, outside of the three-year statute of limitations period, the "central issue" was "whether the discovery rule applies to a claim for conversion under the Maryland UCC." *Id.* at 444. The federal district court, in an issue of apparent first impression, adopted the majority approach and concluded that "the Maryland Court of Appeals would refuse to apply the discovery rule to UCC conversion claims" under CL § 3-118(g), because courts adopting the majority position grounded their opinions on "policy considerations identical to those underlying Maryland's version of the UCC." *Id.* at 449-50. Accordingly, the district court granted partial summary judgment in favor of SunTrust on any checks converted before April 21, 2007. *Id.* at 450.

Two major principles underlie the majority approach: (1) the finality, predictability, and swift resolution of commercial transactions and (2) the perceptible nature of the injury at the time of conversion. *See id.* at 447-48 (summarizing principles underlying the majority and minority approaches). The first principle was in the vanguard for UCC drafters, who "sought quick and inexpensive resolution of commercial disputes," which is "particularly important with negotiable instruments where the exigencies of commerce require inexpensive, quick, and reliable transfer of funds." *Menichini*, 995 F.2d at 1231. Because the "only legally significant temporal events are the time of injury and the time of filing," determination of the statute of limitations is simple and "keep[s] the litigation sword in its sheath." *Id.* "The finality of transactions promoted by an ascertainable definite period of liability is essential to the free negotiability of instruments on which commercial

welfare so heavily depends." *Fuscellaro v. Indus. Nat. Corp.*, 368 A.2d 1227, 1231 (R.I. 1977).

Courts that embrace the second principle concerning perceptibility in rejecting the discovery rule on claims involving negotiable instruments "reason that the victim of conversion is often in the best position to prevent or detect the loss." *Mandolfo v. Mandolfo*, 796 N.W.2d 603, 611 (Neb. 2011). The injury to the payee "manifests itself at the time the wrongful act occurs—that is, when the forger deposits or cashes the check." *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 461-62 (D.C. Cir. 1989). Accordingly, the rationale for the discovery rule vanishes in the context of conversion of negotiable instruments.

These same principles apply to claims under CL § 3-118(b). First, the official comment 2 to § 3-118 of the Maryland UCC reflects the drafters' intent to provide finality and resolution of notes, while accounting for their unique features:

> Subsections (a) and (b) apply to notes. . . . If the note is payable on demand, there are two limitations periods. Although a note payable on demand could theoretically be called a day after it was issued, the normal expectation of the parties is that the note will remain outstanding until there is some reason to call it. If the law provides that the limitations period does not start until demand is made, the cause of action to enforce it may never be barred. On the other hand, if the limitations period starts when demand for payment may be made, i.e. at any time after the note was issued, the payee of a note on which interest or portions of principal are being paid could lose the right to enforce the note even though it was treated as a continuing obligation by the parties. **Some demand notes are not enforced because the payee has forgiven the debt. This is particularly true in family and other noncommercial transactions. A demand note found after the death of the payee may be presented for payment many years after it was issued. The maker may be a relative and it may be difficult to determine whether the note represents a real or a forgiven debt. Subsection (b) is designed to bar notes that no longer represent a claim to payment and**

30

**to require reasonably prompt action to enforce notes on which there is default. If a demand for payment is made to the maker, a six-year limitations period starts to run when demand is made. The second sentence of subsection (b) bars an action to enforce a demand note if no demand has been made on the note and no payment of interest or principal has been made for a continuous period of 10 years. This covers the case of a note that does not bear interest or a case in which interest due on the note has not been paid. This kind of case is likely to be a family transaction in which a failure to demand payment may indicate that the holder did not intend to enforce the obligation but neglected to destroy the note. A limitations period that bars stale claims in this kind of case is appropriate if the period is relatively long.**

CL § 3-118(b), cmt. 2 (emphasis added). We perceive the militancy articulated in the official comments against open-ended liability on negotiable instruments to apply with equal force to sections 3-118(b) and 3-118(g). Indeed, the statute of limitations under § 3-118(b) is far greater (six years, on demand, or ten years, no demand) than the period under § 3-118(g) (three years). If it is reasonable to enforce the three-year statute of limitations for negotiable instruments without the discovery rule under § 3-118(g), the same reasons should apply, *a fortiori*, to enforce a much expanded ten-year or six-year limitations period under § 3-118(b) where the overarching principles discussed above are present. As the instant case amply demonstrates, JJF Management did not bring its claim until after Mr. Bell's death. To allow such a claim, unfettered by any finite period by application of the discovery rule, would defy the Maryland UCC's purposes of certainty and finality in commercial transactions. *See Fuscellaro*, 368 A.2d at 1231.

Second, because a negotiable instrument is defined (in relevant part) as "an unconditional promise or order to pay a fixed amount of money," which may only be "payable on demand or at a definite time[,]" the promise or order for payment is apparent

31

on the instrument itself.  CL § 3-104(a).  Unlike the situation in which a claimant may not be aware of a claim (and the discovery rule may, therefore, toll the statute of limitations), the payee on a negotiable instrument may determine his or her rights by reviewing the instrument, and, in the case in which payment is due on demand, may assert his or her claim immediately.

We hold that, in the absence of fraudulent concealment, the discovery rule does not apply to toll the statute of limitations for an action to enforce a note payable on demand under CL § 3-118(b).  Consequently, because JJF Management does not assert that Mr. Bell fraudulently concealed the note or its terms, the JJF Management Claim is time-barred.

*Continuation of Events Theory*

Finally, we reject the Fitzgerald Parties' contention that, under the continuation of events theory, the parties' confidential relationship tolled the applicable limitations period. At oral argument, counsel for JJF Management clarified that JJF Management had received a copy of the 1998 Note when it was executed and has maintained a copy of the 1998 Note in its possession ever since.  If the continuation of events theory is even applicable to the limitations period set forth under CL § 3-118, a confidential relationship did not eliminate JJF Management's duty to investigate or absolve JJF Management of any knowledge of the note and its terms.  There is no dispute of material fact here—JJF Management received a copy of the 1998 Note, and the 1998 Note provides that payment is due on demand. Accordingly, because JJF Management had actual knowledge of its claim under the 1998 Note, or, at a bare minimum, should have known of its claim, the existence of a confidential

32

relationship could not serve to toll the limitations period. *See Supik*, 152 Md. App. at 714-15.

JJF Management complains that Mr. Bell "never advised [Mr. Fitzgerald] that [he] should obtain separate legal counsel to advise [him] regarding the terms and conditions of the [1998 Note]" or "that the note was coming due or that [the parties] should renegotiate the terms of the note, or that JJF Management should bring suit against [Mr.] Bell to enforce the note." This argument improperly twists the statute of limitations from a factual inquiry into a legal one. *See Moreland v. Aetna U.S. Healthcare, Inc.*, 152 Md. App. 288, 297-98 (2003). Because JJF Management had actual, or inquiry, notice of the terms relating to the 1998 Note, it was able to assert a demand for payment.

Furthermore, the Maryland Rules of Professional Conduct do not toll the statute of limitations for breach of contract, and the Fitzgerald Parties' reliance on *Law Offices of Peter H. Priest, PLLC v. Coch*, 780 S.E.2d 163 (N.C. 2015), is misplaced. In *Coch*, the attorney entered into a contract with his former client whereby the attorney would provide legal services relating to a patent in exchange for an interest in the proceeds upon the sale of the patent to a third party. *Id.* at 165-66. The attorney failed to meet the requirements of North Carolina's version of Rule 1.8, and the Court of Appeals of North Carolina held that "for the sake of maintaining the public's trust, attorneys should be held to abide by Rule 1.8(a)'s explicit requirements as a condition of their own recovery when that recovery is based on business transactions with their clients." *Id.* at 172. Here, the Estate is not attempting to collect a debt, but, rather, the Fitzgerald Parties are attempting to use Rule 1.8 as a sword to overcome their delay in pursuing collection of the 1998 Note years after

33

the Fitzgerald Parties were put on inquiry notice of Mr. Bell's default. The Preamble to the Maryland Rules of Professional Conduct specifically cautions against utilizing the Rules beyond their purpose:

> The Rules are designed to provide guidance to attorneys and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for an attorney's self-assessment, or for sanctioning an attorney under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Nevertheless, in some circumstances, an attorney's violation of a Rule may be evidence of breach of the applicable standard of conduct. Nothing in this Preamble and Scope is intended to detract from the holdings of the Court of Appeals in *Post v. Bregman*, 349 Md. 142 (1998) and *Son v. Margolius, Mallios, Davis, Rider & Toma*r, 349 Md. 441 (1998).

Maryland Rule 19-300.1.

In sum, we conclude that JJF Management had actual knowledge, or, at a bare minimum, inquiry notice of its claim under the 1998 Note after receiving a copy when it was executed. Accordingly, having resolved that the discovery rule is inapplicable to demand promissory notes governed by the statutes of limitations periods under CL § 3-118(b), we hold that JJF Management's claim under the 1998 Note became time-barred when JJF Management failed to demand payment, and Mr. Bell failed to pay on the principal or interest for a continuous period of ten years.

### *Conclusion*

We hold that the orphans' court properly granted summary judgment in favor of the Estate on the JJF Management Claim on the 1998 Note. JJF Management failed to demand payment within the period CL § 3-118(b) requires, and JJF Management had knowledge

34

of its claim under the 1998 Note.  Neither the discovery rule, nor the existence of a confidential relationship, served to toll the limitations period under CL § 3-118(b).  We also hold that the orphans' court erred in granting summary judgment on statute of limitations grounds on the Fitzgerald Claim under the 1992 Deed of Trust because the record does not establish when the claim accrued.  Accordingly, we affirm, in part, and reverse, in part, the judgment of the orphans' court and remand to the orphans' court for further proceedings consistent with this opinion.

**JUDGMENT OF THE ORPHANS' COURT FOR MONTGOMGERY COUNTY AFFIRMED, IN PART, AND REVERSED, IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY 50% BY APPELLANTS AND 50% BY APPELLEES.**